## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Maysee T. L.,                                    Case No. 21-cv-410 (TNL)

        Plaintiff,

v.                                                             **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

        Defendant.

---

Charles J. Llyod, Paul A. Livgard, and Stephanie Ann Christel, Livgard & Lloyd PLLP, P.O. Box 14906, Minneapolis, MN 55414-0906 (for Plaintiff); and

Elvi Jenkins, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Maysee T. L. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] [1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 22, 27. Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 22, is **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's Motion for Summary Judgment, ECF No. 27, is **GRANTED IN PART** and **DENIED IN PART;** and this matter is remanded to the Social Security Administration for further proceedings.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that she has been disabled since September 2016 due to, among other impairments, prediabetes, high blood pressure, chronic pain in her hands, carpal tunnel syndrome, and gout.[2]  Tr.  11, 62, 63, 82, 104, 105, 121, 122.b  Plaintiff's applications were denied initially and again upon reconsideration. Tr. 11, 80, 98, 100, 101, 119, 136, 138, 139.

Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ"). Tr. 11, 162-63. The ALJ held a hearing in June 2020, and issued an unfavorable decision. Tr. 11-22, 38-61. Plaintiff requested review from the Appeals Council, which was denied. Tr. 1-4.

Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 22, 27. This matter is now fully briefed and ready for a determination on the papers.

---

[2] While Plaintiff also claimed disability on the basis of depression, Tr. 63, 82, 105, 122, the issues at hand concern Plaintiff's physical impairments. Additionally, Plaintiff asserts that she did "not allege disability due to gout." Pl.'s Mem. in Supp. at 18, ECF No. 23. Gout, however, is listed as one of the illnesses, injuries, or conditions upon which Plaintiff claimed disability. Tr. 63, 82, 105, 122.

## III. RELEVANT MEDICAL RECORDS

### A. 2017

In early May 2017, Plaintiff began acupuncture to address pain in her feet, hands, neck, shoulders, head and back.  Tr. 533, 680, 931-35.  Plaintiff's pain in her feet and fingers had been ongoing for over ten years.  Tr. 533, 680, 931, 934.  Plaintiff rated the pain in her feet at 10 out of 10 and the pain in her hands at 8 out of 10.  Tr. 533, 680, 931-32; *see also* Tr. 940.  Plaintiff reported receiving steroid shots to treat the pain.  Tr. 533, 680, 931-32.  Upon examination, it was noted that Plaintiff had "tenderness and pain in [her] trapezius, levator, rhomboids, latissimus dorsi and medial foot."  Tr. 553; *accord* Tr. 680, 931.  Between May and August, Plaintiff received acupuncture and cupping treatments approximately once per week.  Tr. 532, 531, 530, 529, 680, 679, 678, 677, 676, 931, 930, 929, 928, 927.  While these treatments tended to help Plaintiff's body pain, she continued to experience pain in her hands and feet with limited improvement.  Tr. 532, 531, 530, 529, 679, 678, 677, 676, 930, 929, 928, 927.

Plaintiff underwent a course of physical therapy for bilateral plantar fasciitis between June and July.  Tr. 369-90.  At her initial assessment, she reported that she has "been having pain in her feet but worse on the right for several years."  Tr. 390.  Plaintiff's "first steps out of bed [we]re very painful" and her foot pain made it "difficult to walk and stand and do chores."  Tr. 390.  Plaintiff's pain responded to treatment, but then would return.  Tr. 390.  It was noted that Plaintiff "walk[ed] on the lateral aspect of the foot to decrease tension of the plantar fascia."  Tr. 390.  Towards the middle of July, Plaintiff reported that "her feet have been getting better and better."  Tr. 376; *see also* Tr.

374.  Plaintiff additionally reported that the physical therapy and new, more supportive shoes "have really helped."  Tr. 372; *see* Tr. 378.  At the time of her discharge, Plaintiff was walking normally, although she felt "a pull on her plantar fascia."  Tr. 369.  Plaintiff had achieved 90% of her goals to improve "stand time to 30 minutes for cooking" and "ambulation time to 30 minutes for community integration."  Tr. 369-70.

Towards the end of August, Plaintiff was seen by Grete F. Thomsen, PA-C, her primary care provider, for complaints of body aches, pain, and numbness in her hands and feet.  Tr. 483.  Plaintiff "describe[d] a specific area on the mid palms of [her] bilateral hands and mid plantar aspect of [her] bilateral feet."  Tr. 483.  The numbness was "worse in the morning."  Tr. 483.  Plaintiff reported ongoing symptoms for the last two to three years.  Tr. 483.  Injections had not produced any change in her symptoms. Tr. 483.  Thomsen noted there was "[n]o significant weakness," and Plaintiff had normal range of motion, strength, and sensation upon examination.  Tr. 484.  Plaintiff did have positive Phalen's sign.  Tr. 484.  Laboratory tests were ordered and a limited prescription for "Tylenol #3"[3] was given.  Tr. 485; *see* Tr. 480.

Roughly one week later, Plaintiff followed up with Thomsen.  Tr. 480.  Thomsen noted that there were "[n]o significant abnormalities" in Plaintiff's lab results to explain her symptoms and referred Plaintiff for a neurologic consultation.  Tr. 482; *see* Tr. 456.

Plaintiff continued with acupuncture and intermittent cupping treatment between September and early October.  Tr. 528, 527, 675, 674, 926, 925.  Plaintiff's hands and feet continued to be the most painful.  Tr. 528, 527, 675, 674, 926, 925.  While Plaintiff

---

[3] "Tylenol #3" is a combination of acetaminophen and codeine.  Tr. 484.

occasionally reported feeling better after treatment, her pain tended to return within a few days.  Tr. 528, 527, 675, 674, 926, 925.

In early October, Plaintiff was seen by neurology.  Tr. 456.  Plaintiff reported her pain began approximately ten years ago, but had been worse more recently.  Tr. 456. Plaintiff reported pain and stiffness as well as occasional numbness and tingling in her hands, primarily in her knuckles.  Tr. 456.  Plaintiff reported dropping things and "her fingers will curl up about twice/week."  Tr. 456.  Plaintiff also reported constant pain in the middle of the bottom of both of her feet.  Tr. 456.  Plaintiff rated her pain between 8 and 9 out of 10 and reported that she tried cortisone injections without success.  Tr. 456.

Plaintiff "ha[d] signs of neuropathy on examination" and labs were ordered "to assess for etiology."  Tr. 457.  Plaintiff was also prescribed gabapentin.[4]  Tr. 457.  It was further noted that Plaintiff's hands were "quite stiff" and she had "difficulty with movements of her joints."  Tr. 457.  Plaintiff otherwise had full strength in her upper and lower extremities and a normal gait.  Tr. 457.  A consultation with rheumatology was recommended and Plaintiff was directed to follow up in three months.  Tr. 457.

In mid-November, Plaintiff was seen in a chiropractic clinic with complaints of "ongoing headaches, neck pain, middle upper back pain, low back pain, shoulder pain, right and left upper extremity arm pain and leg pain," which she similarly reported "has been ongoing on [and] off over the past 10 years."  Tr. 335.  Among other things, Plaintiff stated she had increased pain with walking and dressing and was unable to walk

---

[4] Among other things, gabapentin is "used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles)."  *Gabapentin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007.html (last accessed Aug. 31, 2022).

more than half a mile or sit for more than half an hour due to pain.  Tr. 335; *see* Tr. 336.

Plaintiff also stated that she could not stand for more than half an hour without increased

pain.  Tr. 336.

Plaintiff was noted to have

> an acute measure of tenderness found in the mid to upper
> cervical region and the lower cervical region bilaterally.
> There was an acute degree of pain and discomfort found in
> the cervicothoracic region bilaterally.  Tenderness was found
> to an acute degree affecting the mid to upper thoracic region
> and the thoracolumbar region bilaterally.  Moderately
> severe muscle hypertonicity was evident bilaterally in the lower
> lumbar region.  Acute tenderness was evident bilaterally in
> the lower lumbar region.

Tr. 338.  It was recommended that she undergo "a course of conservative chiropractic

manual manipulation along with soft tissue muscle work trigger point therapy and use of

adjunctive physiotherap[ies] in an effort to reduce [her] pain levels, promote healing and

restore more normal joint function."  Tr. 338.

In mid-December, Plaintiff was seen by Steve Nelson Flinkenstein, DO, in

rheumatology with complaints of joint pain in her hands and feet.  Tr. 417.  Plaintiff

likewise reported that her pain began approximately ten years ago and had become worse

over the past two to three years.  Tr. 417.  Plaintiff reported that she felt stiff for

approximately ten minutes in the morning and rated her pain between 8 and 9 out of 10.

Tr. 417.  Plaintiff benefitted from a prior cortisone injection in her hand.  Tr. 418.

Dr. Flinkenstein noted "some subtle fullness over some of [Plaintiff's] MCP joints

in a symmetrical pattern hence perhaps related to [rheumatoid arthritis]."  Tr. 418.

Plaintiff's foot pain was "mainly over [her] arches" and a "high plantar arch [wa]s

appreciated," which was "perhaps playing a role."  Tr. 418.  There was "[n]o clear signs of synovitis noted involving foot joints."  Tr. 418.  Plaintiff "appear[ed] to have right third[-]digit trigger finger given catching sensation noted on exam" and Dr. Flinkenstein noted that Plaintiff reported experiencing cramping in her hands, particularly in her "right hand at night."  Tr. 418.   Dr. Flinkenstein prescribed meloxicam[5] and Flexeril.[6]  Tr. 419.  He also ordered x-rays of Plaintiff's hands and feet and laboratory tests.  Tr. 419.

Plaintiff's laboratory results "were within normal limits."  Tr. 416.  There was "[n]o fracture, dislocation, erosions or significant degenerative changes" noted in Plaintiff's hands.  Tr. 416; *see also* Tr. 415.  The x-rays of Plaintiff's feet showed "[m]oderate enthesopathy[7] at the origin of the plantar fascia," but were otherwise unremarkable.  Tr. 416; *see also* Tr. 415.

Plaintiff continued with acupuncture and cupping treatments in November and December.  Tr. 527, 526, 525, 674, 673, 672, 925, 924, 923.  Consistent with her previous sessions, these treatments tended to help with Plaintiff's body pain, but she continued to experience pain in her hands and feet with any improvement lasting only for a few days.  Tr. 527, 526, 525, 674, 673, 672, 925, 924, 923.

Plaintiff likewise attended approximately three chiropractic sessions per month between mid-November 2017 and the end of March 2018 when she was discharged.  Tr.

---

[5] "Meloxicam is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints)."  *Meloxicam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601242 html (last accessed Aug. 31, 2022).
[6] Flexeril is a brand name for cyclobenzaprine, a medication "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Aug. 31, 2022).
[7] "Enthesopathy refers to a disorder involving the attachment of a tendon or ligament to a bone."  Tr. 416.

340-55.  She was most often noted to have between moderate and moderately severe tenderness, pain, and discomfort in her mid to upper and lower cervical region, cervicothoracic region, and lower lumbar region.  Tr. 340, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352.  Plaintiff's muscle hypertonicity in her lumbar spine ranged from moderate at the beginning of her sessions to mild to nominal.  *Compare* Tr. 340 (moderate) *with* Tr. 342 (mild) *with* Tr. 350, 354 (nominal).

At her session in the beginning of March, Plaintiff reported increased pain and soreness in her neck and back, stating that she "ha[d] been trudging through some heavier snow."  Tr. 352.  Although she "did not have to shovel," Plaintiff felt "she may have stressed her back."  Tr. 352.  Plaintiff rated her pain at 6 out of 10.  Tr. 352.  During her sessions in the middle to end of March, Plaintiff's tenderness, pain, and discomfort improved to mild to moderate.  Tr. 353, 354, 355.

### B. 2018

During an appointment with Thomsen in early January for an unrelated condition, Plaintiff reported that her "[a]bility to walk long distances [wa]s limited due to pain" in her legs and feet.  Tr. 474.  Plaintiff requested an "application for disability parking."  Tr. 474. Thomsen noted that "[s]he has had one in the past," and completed the paperwork. Tr. 474, 476.  Thomsen encouraged Plaintiff to schedule an appointment with neurology. Tr. 476.

Plaintiff followed up with Dr. Flinkenstein towards the end of February.  Tr. 414. Plaintiff reported that her pain could be as high as 8 out of 10.  Tr. 414.  Dr. Flinkenstein noted that "[m]edications have been helpful."  Tr. 414.  Plaintiff was "doing better" with

8

meloxicam, and Flexeril had "been helpful for the cramping involving her hands."  Tr. 415.  Dr. Flinkenstein continued Plaintiff's meloxicam and Flexeril prescriptions and added Voltaren[8] gel, which Plaintiff could "alternate with meloxicam for hand pains and/or right third[-]digit trigger finger/A1 pulley region."  Tr. 416.  Plaintiff was directed to follow up in four months.  Tr. 416.

Approximately one month later, Plaintiff followed up with neurology.  Tr. 453.  Plaintiff reported slightly decreased pain at 7 out of 10.  Tr. 453.  Plaintiff continued to report difficulties with her right hand, primarily "in the knuckles" and with her "third finger."  Tr. 453.  Plaintiff also had difficulty making a fist.  Tr. 453.  Plaintiff thought the gabapentin "may be helping on most days with the pain."  Tr. 453.  Plaintiff's "[p]hysical exam was unremarkable except for decreased [range of motion] in [her] right hand."  Tr. 454.  Plaintiff was noted to be "most likely experiencing mild peripheral neuropathy and may have an additional joint condition."  Tr. 454.  Plaintiff was offered physical therapy for her right hand, but she declined.  Tr. 455.

Between the end of January and early April, Plaintiff attended eight sessions of physical therapy to address pain in her right shoulder and low back.  Tr. 357-67.  Plaintiff reported that her back pain "limits household duties."  Tr. 368.  Upon examination, Plaintiff demonstrated full range of motion and bilateral lower extremity strength, but "hypermobility at T4-T7 > lumbar spine [was] noted."  Tr. 368.  During her sessions,

---

[8] Voltaren is a brand name for topical diclofenac. *Diclofenac Topical (arthritis pain)*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a611002.html (last accessed Sept. 1, 2022).  "Diclofenac is in a class of medications called nonsteroidal anti-inflammatory drugs (NSAIDs).  It works by stopping the body's production of a substance that causes pain." *Id.*

Plaintiff consistently rated her pain between 6 and 7 out of 10.  Tr. 367, 365, 363, 362, 360, 359, 358, 357.

Plaintiff also continued with acupuncture and cupping treatments between January and May.  Tr. 525, 524, 523, 522, 521, 520, 672, 671, 670, 669, 668, 667, 923, 922, 921, 920, 919, 918.  Any relief Plaintiff experienced from treatment continued to last only a few days.  Tr. 524, 523, 522, 671, 670, 669, 922, 921, 920.  In early February, Plaintiff reported that she did not take pain medications because they did not help her.  Tr. 524, 671, 922.  Around mid-April, Plaintiff reported "a lot of pain in her feet and legs" after "she was standing a lot during the weekend."  Tr. 522; *accord* Tr. 669, 920.  At the end of May, Plaintiff had increased pain in her legs after walking at a park with her family over the weekend.  Tr. 520, 667, 918.

In early May, Plaintiff sought chiropractic treatment for "pain and discomfort all over throughout her back and neck," which radiated into her arms and legs.  Tr. 405; *accord* Tr. 773.  Plaintiff described her pain as "constant and not changing" and stated that it varied "from sharp to dull."  Tr. 405; *accord* Tr. 773.  Upon examination, "[p]alpated misalignment and restriction throughout the cervical, thoracic and lumbar/pelvic spinal areas was observed" along with "[d]ecreased cervical and lumbar/pelvic range of motion."  Tr. 405; *accord* Tr. 773.  "Muscle spasms and tightness throughout the cervical, thoracic, and lumbar/pelvic spine bilaterally' were also observed.  Tr. 405; *accord* Tr. 773; *see* Tr. 406, 774.  Plaintiff also had positive straight leg raising bilaterally.  Tr. 408-09, 776-77.  Plaintiff was diagnosed with "[s]egmental and somatic dysfunction" of the cervical, thoracic, and lumbar regions; cervicalgia; "[p]ain in [the]

10

thoracic spine"; low-back pain; radiculopathy in the cervical and lumbar regions; and muscle spasm.  Tr. 405, 409-10; *accord* Tr. 773, 778.  Plaintiff received chiropractic treatment roughly once a week between May and the middle of August.  Tr. 393-405, 761-773.  More often than not, Plaintiff had increased soreness in her back, particularly in her lower back.  Tr. 402, 401, 399, 397, 396, 395, 393, 761, 763, 764, 765, 767, 769, 770.  Plaintiff also, however, reported improvement in her pain with treatment and feeling more mobile.  Tr. 404, 403, 400, 398, 394, 762, 766, 768, 771, 772.

Plaintiff was next seen by Thomsen around the middle of May for complaints of gout in both feet, more so in the right foot.  Tr. 471.  Plaintiff reported "recurrent issues with pain particularly in the right great toe over the past few years" with redness and swelling.  Tr. 471.  Thomsen ordered a check of Plaintiff's uric acid level, which was "abnormal."  Tr. 472.  Plaintiff was prescribed indomethacin[9] and allopurinol.[10]  Tr. 472. During a check-up approximately three weeks later, Plaintiff was "feeling better and ha[d] less pain."  Tr. 468.  She was also "work[ing] on weight loss with regular walking," among other things.   Tr.  468.   Thomsen rechecked Plaintiff's uric acid level and increased her allopurinol prescription.  Tr. 469.  Plaintiff's "Tylenol #3" prescription was also renewed at her request.  Tr. 468.

---

[9] "Indomethacin is used to relieve moderate to severe pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), and ankylosing spondylitis (arthritis that mainly affects the spine)." *Indomethacin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a681027 html (last accessed Aug. 31, 2022).

[10] "Allopurinol is used to treat gout (a type of arthritis in which uric acid, a naturally occurring substance in the body, builds up in the joints and causes sudden attacks of redness, swelling, pain, and heat in one or more joints)." *Allopurinol*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682673 html (last accessed Aug. 31, 2022).

Plaintiff saw Thomsen again in early July.  Tr. 465.  Plaintiff reported "occasional pain in her feet" and requested "a prescription for a cane."  Tr. 465.  Thomsen "provide[d] a prescription for a cane for her to use if needed."  Tr. 467.

Plaintiff continued with acupuncture between June and September.  Tr. 519, 518, 517, 516, 515, 666, 665, 664, 663, 662, 917, 916, 915, 914, 913.  Again, any pain relief lasted only a few days.  Tr. 519, 518, 516, 666, 665, 663, 917, 916, 914.  Plaintiff's pain increased when she was gardening and decreased when she did not garden.  Tr. 515-18, 661-63, 913-16.

Plaintiff was next seen by neurology near the end of September.  Tr. 450.  Plaintiff reported that the gabapentin was helpful and she was "interested in increasing the dosage."  Tr. 450.  Plaintiff "continue[d] to complain of some paresthesias."  Tr. 451. Plaintiff's gabapentin dose was increased and she was directed to continue following up with rheumatology and her primary care provider.  Tr. 451.

Plaintiff returned to Thomsen in early October.  Tr. 462.  Plaintiff's gout had resolved with the allopurinol.  Tr. 462.  Plaintiff repeated her desire for a "cane to help with gait instability" and requested that the prescription be resent to the medical-device company," which Thomsen did.  Tr. 462, 464.

Plaintiff attended another seven sessions of physical therapy to address her low-back pain between the middle of September and the end of October.  Tr. 330-31, 504-09. Similar to prior sessions, Plaintiff rated her back pain between 6 and 7 out of 10.   Tr. 331, 330, 509, 508, 507, 506.  Plaintiff was discharged at the end of October due to "[m]aximum benefit achieved."  Tr. 504.

12

Notes from Plaintiff's acupuncture treatments between October and December indicate that, while Plaintiff was still experiencing pain in her low back, neck, shoulders, hands, and feet, she was feeling better overall.  Tr. 512, 513, 514, 515, 662, 661, 660, 659, 658, 913, 912, 911, 910, 909.

### C. 2019

Plaintiff continued with acupuncture and intermittent cupping treatment on roughly a weekly basis in January, March, and April 2019.  Tr. 658, 657, 656, 655, 654, 909, 908, 907, 906, 905.  Plaintiff was unable to attend treatment during the month of February due to an insurance issue.  Tr. 656, 907.  Plaintiff's pain, particularly in her lower back and sacral area, increased during the gap.  Tr. 656, 907.  In early April, Plaintiff reported having difficulty walking after straining her back, and it was noted that she was using a cane.  Tr. 655, 906.  The following week, Plaintiff's back pain improved and she was no longer using a cane.  Tr. 655, 906.  The week after, however, Plaintiff's pain in her lower back "flared up" and she reported difficulty walking.  Tr. 654, 905.

In early April, Plaintiff saw Thomsen in connection with complaints of pain in her right hand "for a while" and low-back pain that started approximately one week ago.  Tr. 982.  Plaintiff reported that she "now needs to walk with a cane."  Tr. 982.  With respect to Plaintiff's right hand, Plaintiff's pain was located in the middle of her hand and present at all times.  Tr. 982.  Plaintiff also "described some numbness and tingling with radiation to the fingers at times."  Tr. 982.  There was no reported weakness.  Tr. 982.  Upon examination, Plaintiff was tender to palpation, but there was "no swelling, redness or ecchymosis."  Tr. 983.  Plaintiff had full range of motion for flexion and extension; her

sensation was "grossly normal"; and she had "normal pulses bilaterally." Tr. 983. Thomsen prescribed use of a "wrist splint at night and during periods of increased activity," and directed Plaintiff to "follow up with ortho if no improvement or worsening." Tr. 983.

As for Plaintiff's pain in her lower back, Thomsen noted that Plaintiff had "[w]oke[n] up in the middle of the night with stiffness" and "ha[d] been using a cane to help with ambulation due to pain." Tr. 982. There was no weakness or radiation of pain noted. Tr. 982. Thomsen also noted that Plaintiff "has had issues with pain in her feet intermittently for years, and that is unchanged." Tr. 982. Thomsen started Plaintiff on methocarbamol[11] and recommended that she continue with physical therapy. Tr. 983.

Plaintiff followed up with Thomsen three weeks later. Tr. 979. Plaintiff reported that the methocarbamol "was helping" with her pain, but the "pain has returned over the past few weeks." Tr. 979. Plaintiff was interested in whether an increased dose might help. Tr. 979. Plaintiff was also interested in a topical treatment for her hand pain. Tr. 979. Thomsen prescribed Voltaren gel for Plaintiff's hand and increased her methocarbamol prescription. Tr. 980-81. Thomsen also noted that Plaintiff had not been consistently taking allopurinol, a medication "designed to low[er] the level [of uric acid] and prevent episodes of gout," and encouraged her to take this medication every day. Tr. 981.

---

[11] "Methocarbamol is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Methocarbamol*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682579 html (last accessed Aug. 31, 2022).

Between the middle of May and the middle of July, Plaintiff received chiropractic treatments on a weekly basis. Tr. 753-60. These treatments were primarily concentrated on back and neck pain. Tr. 760, 759, 758, 757, 755, 753; *see* Tr. 754.

Towards the end of May, Plaintiff saw Thomsen again. Tr. 974. Plaintiff reported some improvement in her hand pain with the Voltaren gel. Tr. 974. Plaintiff also reported "improved compliance with [her] medications" and that she was "feeling better." Tr. 974. Thomsen noted that Plaintiff's "motor exam [was] grossly intact"; her "sensation [was] normal to light touch"; and her "[g]ait [was] normal." Tr. 975. Thomsen's examination of Plaintiff's lumbar spine revealed "normal position and motion" and "grossly normal" range of motion as well as a "normal" motor exam bilaterally. Tr. 975. Thomsen prescribed a shower chair in connection with Plaintiff's low back pain and noted that another course of physical therapy would be considered if there were "recurrent issues." Tr. 976; *see* Tr. 977.

Three days later, Plaintiff followed up with Dr. Flinkenstein concerning her hand and foot pain. Tr. 892. Plaintiff reported that the "meloxicam, Voltaren gel and Flexeril combination were helpful," however, she had "r[u]n out of these medications over the past several months." Tr. 894; *see* Tr. 892. Upon examination, Dr. Flinkenstein observed: "Palpating hand joints did not reproduce any pains, no clear signs of synovitis noted. Positive discomfort involving plantar midfoot regions bilaterally on palpation, no warmth erythema or synovitis noted involving the joints." Tr. 894. Additionally, Plaintiff "demonstrated good passive/active [range of motion] over other joints with no warmth, erythema, tenderness or noted over these joints." Tr. 894. Dr. Flinkenstein

15

renewed Plaintiff's meloxicam, Flexeril, and Voltaren gel prescriptions and encouraged Plaintiff to follow up with her primary care provider regarding the potential for Plaintiff's blood-pressure medication to elevate uric acid levels, increasing her risk for gout. Tr. 896.

In the middle of June, Plaintiff met with Thomsen to discuss x-rays recently taken of her lumbar spine. Tr. 971; *see generally* Tr. 707. Plaintiff reported that, although "chiropractic care[] is helping somewhat," she continued to have pain in her lower back. Tr. 971. With respect to Plaintiff's thoracic spine, the findings were as follows: "Minimal right mid thoracic and left lower thoracic curvatures on the AP view. Lateral thoracic alignment satisfactory. Normal vertebral body heights. Minimal disc degeneration in the thoracic discs with some mild hypertrophic spurring. Visualized lung fields grossly clear." Tr. 707; *see also* Tr. 971. With respect to Plaintiff's lumbar spine, the findings were as follows: "5 lumbar type vertebral bodies. Normal vertebral body heights and alignment. Lumbar disc spaces preserved. Mild to moderate facet degeneration lower lumbar facets. Sacrum and bony pelvis grossly intact. Aortic calcifications." Tr. 707; *see also* Tr. 971. Thomsen ordered an MRI for further evaluation. Tr. 972.

Approximately two weeks later, Plaintiff met with Thomsen to discuss the results of the MRI. Tr. 968; *see generally* Tr. 702-03. The MRI showed "[s]hallow central disc production with small annular fissure at L5/S1" with "[n]o high-grade spinal canal or foraminal stenosis"; "[s]hallow L3/L4 right paracentral/foraminal disc protrusion resulting in mild right subarticular zone and foraminal stenosis"; "[m]oderate to advanced

facet arthropathy at L4/L5, with reactive marrow edema greater on the left side," which it was noted "can be a pain generator"; "[n]o high-grade spinal canal or foraminal stenosis at any level"; and a "[l]arge fibroid within the uterus."  Tr. 703; *see* Tr. 699; *see also* Tr. 968.  Thomsen refilled Plaintiff's prescriptions, including methocarbamol, and referred Plaintiff to orthopedic surgery for a spine evaluation and treatment.  Tr. 969.

Near the end of July, Plaintiff went to the emergency room for itching and a rash from mosquito bites after "she was outside working in her daughter's lawn."  Tr. 888.

Plaintiff had her annual exam with Thomsen around the middle of August.  Tr. 961.  In relevant part, Plaintiff reported continuing pain in her lower back.  Tr. 961.  Thomsen noted that Plaintiff was taking naproxen,[12] which was "working somewhat" and "attending physical therapy."  Tr. 961.  Plaintiff was "not participating in a home exercise program," although she "trie[d] to walk using her cane."  Tr. 961.  Thomsen renewed Plaintiff's naproxen prescription and recommended that Plaintiff "continue with physical therapy and a home exercise program."  Tr. 964.  Thomsen directed Plaintiff to follow up in one month if her symptoms persisted.  Tr. 964.

Plaintiff followed up with Thomsen around the beginning of October for her back pain.  Tr. 955.  Plaintiff was "interested in starting a daily medication due to persistent pain."  Tr. 955.  Thomsen noted that Plaintiff was "using [a] cane for ambulation."  Tr. 956.  Thomsen started Plaintiff on duloxetine hydrocholoride.[13]  Tr. 957.

---

[12] "Naproxen is in a class of medications called NSAIDs.  It works by stopping the body's production of a substance that causes pain, fever, and inflammation."  *Naproxen*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a681029 html (last accessed Aug. 31, 2022).

[13] Among other things, duloxetine is "used to treat pain and tingling caused by diabetic neuropathy (damage to nerves that can develop in people who have diabetes) in adults and fibromyalgia (a long-lasting condition that may

At the beginning of November, Plaintiff returned to see Thomsen.  Tr. 948. Thomsen noted that Plaintiff "stopped taking the allopurinol just to see if gout would recur." Tr. 948.

Three days later, Plaintiff followed up with Dr. Flinkenstein.  Tr. 864.  Plaintiff rated her pain at 7 out of 10 and continued to report her medications were helpful.  Tr. 864.  Dr. Flinkenstein noted that Plaintiff had "shoe inserts for plantar arch related pains." Tr. 866.  Dr. Flinkenstein again observed "[n]o discomfort palpating [Plaintiff's] hand joints" and "no synovitis."  Tr. 865.  Plaintiff had no discomfort to palpation of her "Achilles tendons bilaterally with no warmth[,] erythema[,] or fullness noted." Tr. 866. Plaintiff had "[m]ild discomfort" bilaterally with palpation of her plantar arches.  Tr. 866. Plaintiff otherwise "demonstrated good active/passive [range of motion] over other joints with no warmth, erythema, tenderness or synovitis noted over these joints."  Tr. 866. Dr. Flinkenstein again continued Plaintiff's meloxicam, Flexeril, and Voltaren gel prescriptions and directed Plaintiff to follow up in six months.  Tr. 867.  He also again encouraged her to discuss her blood-pressure medication with her primary care provider given the potential for elevation of uric acid levels.  Tr. 867.

**D.  2020**

Plaintiff had another four sessions of chiropractic treatment in January 2020 to address neck and back pain.  Tr. 749-52.

_____

cause pain, muscle stiffness and tenderness, tiredness, and difficulty falling asleep or staying asleep) in adults and children 13 years of age and older."  *Duloxetine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/ druginfo/meds/a604030 html (last accessed Aug. 31, 2022).  "It is also used to treat ongoing bone or muscle pain such as lower back pain or osteoarthritis (joint pain or stiffness that may worsen over time) in adults."  *Id.*

### E.  PCA Services

Plaintiff was assessed for personal care assistance ("PCA") services in May 2018. Tr. 710-19.  Plaintiff reported needing assistance with dressing, bathing, and going up and down stairs.  Tr. 717-18.  Plaintiff was approved for 1.75 hours of PCA services seven days a week.  Tr. 713, 720.

In May 2019, Plaintiff's PCA service hours were increased to 3.5 hours per day. Tr. 734, 744, 746.  Plaintiff continued to report needing assistance with dressing (due to hand, back, and leg pain) and bathing (due to hand pain).  Tr. 741.  Plaintiff also needed assistance with grooming (due to hand pain) and hands-on assistance when transferring positions.  Tr. 741-42.

Following a reassessment in April 2020, Plaintiff's PCA service hours remained at 3.5 hours.  Tr. 722.  Services continued to be focused on dressing, grooming, bathing, and transferring as well as going to the bathroom.  Tr. 729-30.  During the evaluation, Plaintiff was observed to have limited range of motion, an inability to raise her hands above her head or around to her back, and weakness.  Tr. 730.

### IV. FUNCTION REPORTS

In function reports, Plaintiff stated that she lived with her aunt, who was also her PCA.  Tr. 272, 273, 274, 291.  Plaintiff's aunt helped her dress, wash her back, and care for her hair.  Tr. 273, 292.  Sometimes, Plaintiff forgot to put on clothes.  Tr. 292. Plaintiff's aunt reminded her to take her medication, took care of the laundry and household chores, and did the majority of the cooking.  Tr. 274, 293. Plaintiff

19

occasionally made a sandwich or reheated leftovers.  Tr. 274.  Plaintiff had difficulty holding utensils.  Tr. 273, 292.

Plaintiff stated that she rarely drove and would only go shopping if her aunt was able to come with, which was approximately one to two times per month.  Tr. 275.  Plaintiff's aunt carried any purchases.  Tr. 275.  Plaintiff enjoyed going to a local flea market with her aunt, but was not able to "go on bad pain days."  Tr. 273; *see* Tr. 276, 292.  Plaintiff was able to walk for approximately 10 minutes at a time and then needed a break.  Tr. 276; *cf.* Tr. 294, 295.

When asked how her conditions limited her ability to work, Plaintiff stated that it was "hard to use" her right hand.  Tr. 272; *see also* Tr. 291.  She experienced tingling, numbness, and pain in her right hand and dropped things.  Tr. 272, 277; *see also* Tr. 291.  Plaintiff also had joint pains.  Tr. 272; *see also* Tr. 291.  On bad days, Plaintiff would stay at home in bed and had difficulty with her personal care.  Tr. 273, 276.

Plaintiff also experienced "[a]rm pain with reaching" and "[foo]t and low back pain with standing and walking."  Tr. 277; *see also* Tr. 296.  Some days, Plaintiff also experienced pain with sitting.  Tr. 277.  Plaintiff stated that she could slowly walk one to two blocks before she needed to sit for 15 to 20 minutes, or up to 30 minutes on a bad day.  Tr. 227, 296.  Plaintiff indicated that she had been prescribed a cane, which she used for assistance with walking, standing, and rising from a seated position.  Tr. 278, 297.

## V. OPINION EVIDENCE

### A. Thomsen

Thomsen completed a physical medical source statement. Tr. 695-98. Among other things, Thomsen listed Plaintiff's diagnoses as paresthesia, history of gout, and low-back pain. Tr. 695; *see also* Tr. 34. Thomsen described Plaintiff's prognosis as "fair" and included "chronic low back pain" among her symptoms. Tr. 695. When characterizing Plaintiff's pain, Thomsen stated it was located in her lower back, caused "gait instability at times," and was "worse with prolonged use." Tr. 695; *see also* Tr. 34. When asked about the clinical findings, test results, and objective signs, Thomsen noted that an "MRI showed facet arthropathy, small disc hernia." Tr. 695; *see also* Tr. 34.

When asked to opine on Plaintiff's functional limitations, Thomsen wrote: "unable to answer, need PT evaluation." Tr. 696. Thomsen checked a box indicating that Plaintiff was "[c]apable of low stress work." Tr. 698. Thomsen likewise indicated that Plaintiff's impairments were likely to produce good days and bad days and estimated that Plaintiff would be absent from work more than four days per month. Tr. 698.

### B. Prior Administrative Medical Findings

On initial review, LaVerne Barnes, DO, assessed Plaintiff's physical residual functional capacity. Tr. 76, 95. Dr. Barnes opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for six hours in an eight-hour day; and sit for six hours in an eight-hour day. Tr. 74, 93.

Plaintiff could frequently climb ramps, stairs, ladders, ropes, and scaffolds and was unlimited in her abilities to balance, stoop, kneel, crouch, and crawl. Tr. 74, 93-94.

21

Plaintiff was limited to "frequent not constant fingering" in her right hand "due to [right] third digit trigger finger."  Tr. 75; *accord* Tr. 94.  She otherwise had no manipulative limitations.  Tr. 75, 94.

Plaintiff was limited to avoiding even moderate exposure to vibration and concentrated exposure to hazards, but otherwise had no environmental limitations.  Tr. 75-76, 94-95.  Plaintiff had no visual or communicative limitations.  Tr. 75, 94.

Dr. Barnes explained that Plaintiff "should avoid walking/working on uneven terrain/ground due to idiopathic neuropathy with absent vibratory sensation as well as unprotected heights, operation of heavy machinery or driving due to sedating effects of medication."  Tr. 76; *accord* Tr. 95.

On reconsideration, Gregory H. Salmi, MD, generally affirmed the findings of Dr. Barnes.  Tr. 114-16, 131-33.  Dr. Salmi, however, concluded that Plaintiff's abilities to balance, stop, kneel, crouch, and crawl were limited to frequently rather than unlimited. Tr. 114-15, 131-32.

## VI. HEARING TESTIMONY

At the hearing, Plaintiff testified that she quit working in 2016 because she "was very stressed," her "brain wasn't working properly," and she had "numbness" in her leg and hands.  Tr. 48.  Plaintiff testified that she still experiences numbness, tingling, and stiffness in her hands, making it difficult for her to hold onto and grab things.  Tr. 48. Plaintiff further testified that she has difficulty holding utensils and sometimes her PCA will have to feed her.  Tr. 49.  Plaintiff testified that she does "not have any clothes with zippers" and her PCA assists with dressing.  Tr. 49.  Plaintiff used to do a little bit of

cooking for herself, but no longer did so anymore.  Tr. 51.  Plaintiff's PCA, sons, and friends assisted her.  Tr. 51; *see* Tr. 52.  Plaintiff currently lived with her PCA.  Tr. 52.

Plaintiff testified that because of standing on her feet for extended periods of time while working, she now experienced pain in her foot and back, which required her to lay down.  Tr. 49.  Plaintiff testified that if she stands for an extended period of time, her legs start to hurt and she cannot walk.  Tr. 49.  Plaintiff testified that she is able to stand for 10 minutes before needing to lay down.  Tr. 50.  Plaintiff testified that she has difficulty walking because her leg goes numb, and she will need to rest and lay down after walking for "a little bit."  Tr. 50.  Plaintiff testified that she uses her cane and walker "all the time."  Tr. 50.

Based on Thomsen's opinion, the ALJ asked the vocational expert whether a person who was absent more than four days per month would be able to maintain competitive employment.  Tr. 54.  The vocational expert testified that this level of absenteeism would preclude competitive employment and one day per month would be acceptable.  Tr. 54.

In relevant part, the ALJ asked the vocational expert to assume a hypothetical person of Plaintiff's age, education, and work experience with

> a medium, medium range of work that's permitted, but the fingering on the right upper extremity side is limited to frequent. . . . it does allow frequent ramp and stair climbing, frequent ladder, rope, and scaffold climbing, frequent balancing, stooping kneeling, crouching, and . . . crawling. For fingering on the right upper extremity side, it limits fingering to frequent . . . .  Says to avoid even moderate exposures to vibration, avoid concentrated exposure to hazards like the operation of dangerous moving machinery or

unprotected heights. Also, . . . to avoid walking or working in
the areas of, of uneven terrain or uneven ground.

Tr. 56-57. The vocational expert testified that Plaintiff would be able to do her previous

work as a medical assembler, but not work as a hand packager or laser operator. Tr. 57.

In response to questioning by Plaintiff's attorney, the vocational expert testified

that if Plaintiff was restricted to work at the sedentary level, she would not be able to

perform her past relevant work. Tr. 58; *see also* Tr. 59. In response to a follow-up

question from the ALJ, however, the vocational expert also testified that if Plaintiff was

restricted to a full range of light work accompanied by the same other restrictions, the

medical assembly position would still be available. Tr. 59.

At the close of the hearing, Plaintiff's counsel highlighted for the ALJ that prior

agency medical determinations "predate the objective medical evidence of the lumbar

MRI with the facet arthropathy," which "support[ed] greater restrictions than the medium

[residual functional capacity]." Tr. 60.

## VII. ALJ'S DECISION

In relevant part, the ALJ found that Plaintiff had the severe impairments of spine

disorders, major joint dysfunction, peripheral neuropathy, and right trigger finger, and

none of these impairments individually or in combination met or equaled a listed

impairment in 20 C.F.R. pt. 404, subpt. P, app. 1. Tr. 14. As to Plaintiff's residual

functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity

to perform medium work,[14]

---

[14] As set forth in the regulations,

> [e]xcept she can frequently climb ramps and stairs, and crawl, and frequently finger with the right upper extremity. She must avoid even moderate exposure to vibration, and she must avoid concentrated exposure to hazards such as the operation of dangerous moving machinery and unprotected heights. She must avoid walking or working in areas of uneven terrain.

Tr. 16. Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff was capable of performing her past relevant work as a medical assembler. Tr. 21. Accordingly, the ALJ concluded that Plaintiff was not under a disability. Tr. 21.

## VIII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863

---

[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

20 C.F.R. § 404.1567(c); *accord* 20 C.F.R. § 416.967(c).

(8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff asserts that the ALJ erred by not including plantar fasciitis among her severe impairments. Plaintiff further asserts that the ALJ erred in determining her residual functional capacity by (a) failing to include restrictions for her neuropathy, plantar fasciitis, and spine disorders; (b) improperly evaluating her subjective complaints; and (c) relying on the prior administrative medical findings.

## A. Plantar Fasciitis as a Severe Impairment

Plaintiff asserts that, at step two, the ALJ failed to include bilateral plantar fasciitis among her severe impairments.[15] According to Plaintiff, "[t]he ALJ ignored the objective diagnostic evidence, treatment records—steroid injections, physical and massage therapies, and myofascial release—and [her] resultant chronic bilateral f[oot] pain, worsened with walking and standing." Tr. 13. Plaintiff asserts that this omission "alone warrants remand." Pl.'s Mem. in Supp. at 13; *see also* Pl.'s Mem. in Supp. at 2.

---

[15] In her reply, Plaintiff contends that "the Commissioner fails to address the fact that the ALJ's failure to make a finding at step two as to whether [Plaintiff's] bilateral plantar fasciitis was severe is error requiring remand." Pl.'s Reply at 3, ECF No. 29. That is not the case. *See, e.g.*, Comm'r's Mem. in Supp. at 10-12, ECF No. 12.

At step two, the ALJ considers the severity of a claimant's medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If a claimant does not have an impairment or combination of impairments that significantly limits her ability to do basic work activities, such impairment or impairments are not severe and the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c); *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("Step two of the evaluation states that a claimant is not disabled if his impairments are not 'severe.'"). "An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707. Basic work activities include but are not limited to things like walking, standing, sitting, lifting, reaching, seeing, hearing, speaking, following instructions, using judgment, responding appropriately to coworkers and supervisors, and dealing with changes in the work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Kirby*, 500 F.3d at 707. It is Plaintiff's burden to establish that her plantar fasciitis singly or in combination with other impairments is a severe impairment. *Id.* While this "is not an onerous requirement . . . , . . . it is also not a toothless standard." *Id.* at 708.

"The plantar fascia is the thick tissue on the bottom of the foot. It connects the heel bone to the toes and creates the arch of the foot. When this tissue becomes swollen or inflamed, it is called plantar fasciitis." *Plantar fasciitis*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/ency/article/007021.htm (last accessed Aug, 31, 2022). This swelling "can be painful and make walking more difficult." *Id.* "A full range of

medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying of objects weighing up to 25 pounds." *Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at *6 (Soc. Sec. Admin. 1983) [hereinafter SSR 83-10]; *see* 20 C.F.R. § 404.1567(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."); *accord* 20 C.F.R. § 416.967(c). "[S]itting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6. "In most medium jobs, being on one's feet for most of the workday is critical." *Id.*

As an initial matter, the Commissioner correctly points out that Plaintiff did not allege disability on the basis of plantar fasciitis in her applications. Plaintiff counters that "[t]his omission is trivial." Pl.'s Reply at 8. The Eighth Circuit Court of Appeals, however, has held that the fact that a claimant did not allege a particular impairment or condition "in her application for disability benefits is significant, even if the evidence of [that impairment or condition] was later developed." *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001); *see Misty G. v. Berryhill*, No. 18-cv-587 (KMM), 2019 WL 1318355, at *3 n.1 (D. Minn. Mar. 22, 2019) (caselaw "suggest[s] that a claimant's failure to identify an allegedly disabling impairment is an appropriate consideration when the claimant argues the ALJ erred in its treatment of that condition"); *see also, e.g.*, *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007). At the same time, Plaintiff's counsel did mention plantar fasciitis at the

hearing before the ALJ, citing to records with the imaging results and diagnosis. *See, e.g.*, Tr. 41; *cf. Mousseau v. Barnhart*, 119 F. App'x 18, 20 (8th Cir. 2004) ("Among other things, because Mousseau did not allege obesity as a basis for disability in her applications or at the hearing, the ALJ was not required to consider it in determining her [residual functional capacity].").

There is no dispute that Plaintiff has been diagnosed with plantar fasciitis in her feet and has a history of foot pain, which she has treated in variety of ways, including acupuncture, injections, physical therapy, and more supportive shoes. There is also no dispute that Plaintiff was prescribed a cane at her request to be used as needed and reported using a walker.[16]

According to Plaintiff, the ALJ "wholly ignored" her plantar fasciitis. Pl.'s Mem. in Supp. at 2. Yet, while the ALJ did not specifically name Plaintiff's plantar fasciitis in the decision, the ALJ noted that "[i]maging has also shown enthesopathy in [Plaintiff's] bilateral feet," the same record Plaintiff's counsel referred to at the hearing, *compare* Tr. 41, 426 *with* Tr. 17, and acknowledged Plaintiff's complaints of foot pain in the discussion of the medical records, *see* Tr. 17, as well as her allegations that "she has difficulty . . . standing longer than 10 minutes before she needs to lie down," "she can walk only one to two blocks slowly before she has to rest for 15 to 30 minutes, . . . and uses a case or walker at all times," Tr. 16. In the discussion of the evidence in this case, the ALJ remarked that Plaintiff "has exhibited a normal gait and has not consistently been

---

[16] To be clear, Plaintiff "is not arguing that the ALJ erred in failing to include use of a cane in the [residual functional capacity]." Pl.'s Reply at 4.

observed using an assistive device."  Tr. 14; *accord* Tr. 18; *see* Tr. 14 ("claimant has not

demonstrated an inability to ambulate effectively"); *see also* Tr. 18 ("Notably, although

she has been prescribed a cane, her treatment records do not reflect consistent use of this

device or a similar device."). The ALJ also observed that there were times at which

Plaintiff "exhibited an abnormal gait."  Tr. 18.

Significantly, Plaintiff herself has not expressly articulated what additional

functional limitations resulted from her plantar fasciitis and should have been included by

the ALJ in her residual functional capacity.  Plaintiff contends that she has "identified

objective evidence supporting standing and walking limitations," Pl.'s Reply at 3, but she

has not explained, let alone established, how her plantar fasciitis significantly limits her

ability to do basic work activities and restricts her abilities to walk and stand.  "It is

appropriate for the ALJ to take a 'functional approach' when determining whether

impairments amount to a disability."  *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir.

2004) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

"To show an error was not harmless, [a claimant] must provide some indication

that the ALJ would have decided differently if the error had not occurred."  *Byes v.

Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).  Even assuming for sake of argument that

Plaintiff's plantar fasciitis was a severe impairment, Plaintiff has not pointed to any

evidence in the record suggesting that the ALJ's determination of her residual functional

capacity would have been different if the ALJ had found plantar fasciitis to be a severe

impairment.  Nor has she "identified any limitation that should have been included or

would have been different if had the ALJ done so."  *Jerome S. v. Saul*, No. 19-cv-931

(ECW), 2020 WL 5798550, at *11 (D. Minn. Sept. 29, 2020); *see Kendrick B. v. Kijakazi*, No. 21-cv-0068 (JFD), 2022 WL 2670052, at *4 (D. Minn. July 11, 2022). Moreover, "[n]umerous district courts in the District of Minnesota, and other districts in the Eighth Circuit, have held that an ALJ's failure to consider an impairment at step two is harmless error if the ALJ considered the effects of the impairment at step two or at a later step of the evaluation process." *Kendrick B.*, 2022 WL at *4 (citing cases); *see also, e.g., Jerome S.*, 2020 WL 5798550, at *9-11; *Rosalind J. G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *18-20 (D. Minn. Mar. 27, 2019); *Misty G.*, 2019 WL 1318355, at *2-5. Here, the ALJ considered Plaintiff's foot pain and her allegations that her impairments limited her abilities to stand and walk when determining her residual functional capacity. *See Misty G.*, 2019 WL 1318355, at *4. "Accordingly, any error resulting from the fact that the ALJ did not find [plantar fasciitis] to be a severe impairment was harmless error that does not warrant remand." *Jerome S.*, 2020 WL 5798550, at *11; *see Byes*, 687 F.3d at 917.

## B. Residual Functional Capacity

A claimant's "residual functional capacity is the most [she] can do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *accord* 20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g., Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some

medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 27 F.4th at 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c).

### 1. Additional Limitations Related to Peripheral Neuropathy, Spine Disorders & Plantar Fasciitis

Plaintiff asserts that the ALJ erred by "failing to include restrictions resultant from [her] peripheral neuropathy in her feet, spine disorders, and bilateral plantar fasciitis in

the [residual functional capacity]."  Pl.'s Mem. in Supp. at 12.  Plaintiff asserts that these impairments and conditions cause "pain in her legs with resultant limitations in walking and standing."  Pl.'s Mem. in Supp. at 12.  Plaintiff points to "[i]maging – lumbar spine MRI showing moderate-to-advanced facet arthropathy and bilateral feet x-rays documenting moderate enthesopathy at the plantar fascia – physical examinations – documenting straight leg raises and restricted lumbar range of motion – and the cane and shower chair prescribed for difficulty walking and standing" as supporting limitations in her abilities to walk and stand.  Pl.'s Reply at 4.  Plaintiff further asserts that the ALJ's residual-functional-capacity determination "limit[ed] only right-hand fingering to frequent, despite [her] bilateral neuropathy symptoms, with the logical conclusion that this restriction accounts for solely the right-hand trigger finger," thus failing to include restrictions related to the peripheral neuropathy in her hands.  Pl.'s Mem. in Supp. at 14.

Plaintiff's argument boils down to a syllogism of sorts: Severe impairments are those impairments that significantly limit a claimant's ability to do basic work activities. Peripheral neuropathy and spine disorders were found by the ALJ to be severe impairments and, according to Plaintiff, plantar fasciitis should have been found to be a severe impairment.  Because severe impairments significantly limit a claimant's ability to work, there must be limitations attributable to such impairments.  Because a claimant's residual functional capacity is the most she can do despite her limitations, the limitations attributable to such impairments must be included in the claimant's residual functional capacity.  Ergo, the ALJ should have included limitations attributable to Plaintiff's

peripheral neuropathy, spine disorders, and plantar fasciitis in her residual functional capacity.

There is some logical appeal to Plaintiff's argument. A claimant's residual functional capacity includes "functional limitations and restrictions that result from an individual's medical determinable impairment or combination of impairments, including the impact of any related symptoms." *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (Soc. Sec. Admin. July 2, 1996) [hereinafter SSR 96-8p].

Nevertheless, it remains Plaintiff's burden to establish her residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016). As stated above in connection with Plaintiff's plantar fasciitis, *see supra* Section VIII.A, Plaintiff criticizes the ALJ for not including limitations related to peripheral neuropathy, spine disorders, and plantar fasciitis, but *Plaintiff herself has not identified what additional functional limitations should have been included by the ALJ in the determination of her residual functional capacity. See Stormo*, 377 F.3d at 807; *see also Shamso M. K. v. Saul*, 19-cv-1531 (TNL), 2020 WL 5798448, at *11 (D. Minn. Sept. 29, 2020); *Kim J. H. v. Saul*, No. 18-cv-2376 (MJD/TNL), 2020 WL 872308, at *7 (D. Minn. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 869963 (D. Minn. Feb. 21, 2020); *cf.* SSR 96-8p, 1996 WL 374184, at *1 ("The [residual-functional-capacity] assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . ."). Plaintiff's argument amounts to little more than speculation that it might be possible to draw a different conclusion

35

regarding her abilities to stand, walk, handle, and finger based on the evidence in the record. *Kim J. H.*, 2020 WL 872308, at *7. This same argument—that it might be possible to reach a conclusion other than the one reached by the ALJ regarding a claimant's residual functional capacity based on the evidence in the record—could be made in nearly every case. *See Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) ("We may not reverse simply because we would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion."); *accord Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017); *see also, e.g., Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019); *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). The Court concludes that Plaintiff has not met her burden to show that the ALJ should have included additional limitations related to peripheral neuropathy, spine disorders, and plantar fasciitis in the residual functional capacity.

### 2. Evaluation of Plaintiff's Pain

Plaintiff asserts that the ALJ erred in evaluating the pain she experiences by "misrepresent[ing] the objective medical evidence, effectiveness of treatment, and [her] daily activities." Pl.'s Mem. in Supp. at 2.

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Admin. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g., Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir.

2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4; *see* 20 C.F.R. §§ 404.1529(c)(2)-(3), 416.929 (c)(2)-(3). Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *7. Although the "absence of objective medical evidence to support [a clamaint's] complaints" of pain is one "factor to be considered," "the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 931-32; *see* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also, e.g.*, *Grindley*, 9 F.4th at 630.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Grindley*, 9 F.4th at 630 ("We normally defer to an ALJ's credibility determination."); *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We

37

will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

### a.   Objective Medical Evidence

In considering the intensity, persistence, and limiting effects of a claimant's pain, the ALJ is required to "consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." SSR 16-3p, 2017 WL 5180304, at *5; *see* 20 C.F.R. §§ 404.1529(a), (c)(2), 416.929(a), (c)(2); *see also, e.g.*, *Grindley*, 9 F.4th at 630; *Halverson*, 600 F.3d at 931. "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2); *accord* 20 C.F.R. § 416.929(c)(2). Objective medical evidence of this type is a useful indicator to assist . . . in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect those symptoms, such as pain, may have on [a claimant's] ability to work . . . ." 20 C.F.R. § 404.1529(c)(2); *accord* 20 C.F.R. § 416.929(c)(2).

To the extent Plaintiff asserts that the ALJ "misrepresented the objective medical evidence" when evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, Pl.'s Mem. in Supp. at 2, Plaintiff has not explained what about the ALJ's recitation of the objective medical evidence amounts to a misrepresentation. That Plaintiff may believe the objective medical evidence provides greater support for her allegations of disabling pain does not mean that the ALJ's conclusion that Plaintiff's allegations of

38

disabling pain were not entirely consistent with the objective medical evidence amounts to a misrepresentation of the record.  *Cf., e.g.*, *Dols*, 931 F.3d at 744; *Fentress*, 854 F.3d at 1021; *Igo*, 839 F.3d at 728; *Goff*, 421 F.3d at 789.

The ALJ accurately summarized the objective medical evidence in the record that both supported and detracted from Plaintiff's allegations of disabling pain.  For example, the ALJ noted that "imaging has shown osteophytes, facet arthropathy, multiple disc protrusions, and foraminal stenosis in [Plaintiff's] lumbar spine"; "disc degeneration and hypertrophic spurring in her thoracic spine"; and "enthesopathy in her bilateral feet."  Tr. 17.  The ALJ additionally noted that, at times, Plaintiff "exhibited an abnormal gait, painful and limited spinal range of motion, limited range of motion in her right hand, and muscle spasms and tightness"; "positive straight leg raise tests"; and "discomfort, tenderness, stiffness, and slow movement in her bilateral hands."  Tr. 18.  Conversely, the ALJ recognized that "imaging has not shown high-grade canal or foraminal stenosis at any level of [Plaintiff's] lumbar spine, and . . . revealed only minimal thoracic disc degeneration and mild hypertrophic spurring in her lumbar spine."  Tr. 17 (quotation omitted).  The ALJ also recognized that Plaintiff's

> records repeatedly reflect displays of no less than 4-/5 to full strength, as well as full range of motion in her lumbar spine and bilateral lower extremities.  In addition, she has exhibited a normal gait and has negative straight leg raise tests. Notably, although she has been prescribed a cane, her treatment records do not reflect consistent use of this device or a similar device.  Likewise, they do not reflect consistent use of wrist braces.  Furthermore, she has displayed intact sensation and reflexes and normal coordination.  Notably, a rheumatology examination in November 2019 yielded no clear signs of synovitis.  It is also important to note that an

autoimmune    workup    performed    at    that    time    was
"unremarkable."

Tr. 18.  The ALJ did not err in considering the objective medical evidence as one factor

in concluding that Plaintiff's pain was not as limiting as she alleged.  *See* Tr. 18, 20.

### b.    Effect of Medications & Treatment

Plaintiff next asserts that the ALJ "misrepresented the effectiveness of [her]

medications and treatment."  Pl.'s Mem. in Supp. at 17 (citation omitted).  Plaintiff

asserts that "[p]hysical therapy, acupuncture, massage therapy, and myofascial release

only temporarily reduced her pain, with pain returning to pre[-]treatment level after just

1-2 days."  Pl.'s Mem. in Supp. at 17 (citation omitted).  Plaintiff additionally asserts that

she received no relief from injections in her hands and feet and, although she received

some relief from medication, she requested an increased dosage due to continuing

symptoms.

The effectiveness of medication and any other treatment other than medication a

claimant uses to alleviate pain or other symptoms are relevant to the intensity,

persistence,  and  limiting  effects  of  a  claimant's  symptoms.  20  C.F.R.

§§ 404.1529(c)(3)(iv), (v), 416.929(c)(3)(iv), (v); SSR 16-3p, 2016 WL 1119029, at *7.

"If an impairment can be controlled by treatment or medication, it cannot be considered

disabling."  *Hensley*, 829 F.3d at 933-34 (quotation omitted).

Plaintiff's argument essentially appears to be that, despite undergoing a variety of

different treatments, she continues to experience pain.  But, there is not really any dispute

that Plaintiff experiences pain.  *See Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir.1999)

("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)); *Nicole W. v. Kijakazi*, No. 20-cv-2697 (SRN/BRT), 2022 WL 3047088, at *5 (D. Minn. July 14, 2022) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain, but complaints of pain alone are not determinative of whether there should be a finding of disability."), *report and recommendation adopted*, 2022 WL 3045130 (D. Minn. Aug. 2, 2022).   Nor did the ALJ conclude that treatment entirely eliminated Plaintiff's pain.   Without intending to be insensitive to the existence of Plaintiff's pain, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quotation omitted).   It was not a misrepresentation of the record for the ALJ to note—correctly—that Plaintiff reported medication, chiropractic treatment, and acupuncture were helpful and improved her pain.   The ALJ properly considered the effectiveness of these treatments in evaluating whether Plaintiff's pain was as limiting as she alleged.

### c.   Daily Activities

Plaintiff next asserts that the "[t]he ALJ[']s brief references to [her] daily activities misrepresent the record and completely ignore her testimony, function reports, and PCA assessments."   Pl.'s Mem. in Supp. at 16; *see also* Pl.'s Mem. in Supp. at 17.   Plaintiff asserts that the ALJ improperly focused on Plaintiff's expressed desire for her own place[17] while "ignor[ing] the fact that [she] was then receiving 3.5 hours of PCA services

---

[17] During a counseling session in mid-November 2019, Plaintiff reported that she was "on a waiting list for public housing" and "stated that she likes to be alone so she wants her own place."  Tr. 787.

per day, with her PCA performing all laundry, household chores, driving, and cooking" as well as "help[ing] with grooming, bathing, and dressing."  Pl.'s Mem. in Supp. at 16; *see also* Pl.'s Mem. in Supp. at 17.  Plaintiff similarly asserts that the ALJ "repeatedly stated that [she] engaged in 'strenuous activity,' including 'trudging through some heavier snow' in March 2018 and gardening in July 2019," when such activities in fact cause increased pain and soreness.  Pl.'s Mem. in Supp. at 16; *see also* Pl.'s Mem. in Supp. at 17.  Plaintiff asserts that the evidence in the record "shows conclusively that [she] could not perform the ALJ's medium [residual functional capacity] – requiring standing and walking most of the day, 'considerable' lifting up to 50 pounds at a time and frequently 25 pounds  -- day in and out, on a consistent sustained basis, in the real world."  Pl.'s Mem. Supp. at 12.  Plaintiff likewise asserts that the ALJ "failed to address [her] good and bad days," which Thomsen opined would cause her to be absent over four days per month.  Tr. 14.

The Commissioner responds that "[w]hile the ALJ acknowledged that Plaintiff received assistance from her aunt, [the ALJ] also noted that Plaintiff reported she would go out with friends when she felt better, went window shopping with family members, and would have parties and hang out with friends."[18]  Comm'r's Mem. in Supp. at 14. The Commissioner additionally responds that "although Plaintiff reports she is unable to perform medium work because of limitations in standing and walking, she reported in September 2019 that her aunt took her out for walks, which also helped her relieve her

---

[18] Notably, these comments about Plaintiff "go[ing] out with friends on days which she felt 'better'"; "window-shopping with family members"; and "'having parties and hanging out with friends'" were in connection with the ALJ's conclusion that Plaintiff's "*psychiatric* symptoms are not as substantial as she alleges," not her *physical* abilities.  Tr. 19 (emphasis added).

pain." Comm'r's Mem. in Supp. at 14; *see* Tr. 835 ("Her PCA will take her out o[n] walks which helps to improve her mood. Walking also helps with her pain."). According to the Commissioner, "[d]espite Plaintiff's contentions, the ALJ did not rely on her limited daily activities to deny her claim of disability, but rather considered her reports of daily functioning as only one factor in considering her subjective complaints." Comm'r's Mem. in Supp. at 14. Citing to *Stewart v. Secretary of Health & Human Services*, 957 F.2d 581 (8th Cir. 1992), and *Qualls v. Apfel*, 158 F.3d 425 (8th Cir. 1998), the Commissioner contends that "the Eighth Circuit has found even fewer, less exertional daily activities to be inconsistent with complaints of disabling symptoms." Comm'r's Mem. in Supp. at 14.

A claimant's daily activities is evidence outside of the objective medical evidence that an ALJ may consider as a factor when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); SSR 16-3p, 2016 WL 1119029, at \*7; *see also, e.g.*, *Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain."); *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003) ("Although participation in these activities does not dispositively show that Ms. Curran-Kicksey's complaints of pain were exaggerated, they certainly were appropriate matters for the ALJ to consider under *Polaski* [*v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)].").

"[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."

43

*Halverson*, 600 F.3d at 932 (quotation omitted); *see also, e.g.*, *Swarthout*, 35 F.4th at 612 ("The ALJ reasonably concluded that other daily activities—caring for personal hygiene, managing medications, preparing simple meals, stretching and performing gentle exercises, watching television, reading the newspaper, going for short walks outside, riding a bike, driving, handling money, doing some laundry, and doing some household chores in short increments—provided evidence that Swarthout is not as limited as she has alleged." (quotation omitted)); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) ("Ponder's activity level undermines her assertion of total disability. Indeed, Ponder admitted that she, among other things, performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family."); *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("Wagner engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends."). "[I]t is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.'" *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Yet, a claimant's daily activities are *a factor* to be considered in evaluating allegations of disabling pain. *See, e.g.*, *Swarthout*, 35 F.4th at 612, *Curran-Kicksey*, 315 F.3d at 969.

44

To the extent Plaintiff contends that the ALJ failed to consider that she would have good and bad days and be absent from work more than four times per month as stated by Thomsen in the assessment of her residual functional capacity, the ALJ was "not persuaded" by Thomsen's opinion and found it "inconsistent with the findings of the State agency consultants" and other evidence in the record. Tr. 20. Plaintiff has not challenged the ALJ's assessment of the persuasiveness of Thomsen's opinion. *See generally* 20 C.F.R. §§ 404.1520c, 416.920c (consideration of medical opinions and prior administrative findings). "The ALJ was not obligated to include limitations from opinions he properly disregarded." *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).

Summarizing Plaintiff's allegations, the ALJ noted that Plaintiff "contends she has difficulty holding utensils and cooking food"; "has difficulty lifting, squatting, bending, standing longer than 10 minutes before she needs to lie down, reaching, sitting, climbing stairs, and seeing"; "can walk only one to two blocks slowly before she has to rest for 15 to 30 minutes"; and "contends that she uses a cane or walker at all times." Tr. 16. The ALJ also noted that Plaintiff "has been observed having difficulty performing personal care tasks, has been prescribed a shower chair, and has been found to be eligible to receive personal care assistant services." Tr. 18.

When discussing Plaintiff's daily activities, the ALJ emphasized Plaintiff's desire for her own place, "reports of engaging in strenuous activity," and "inconsistent use of assistive devices." Tr. 18, 20. The ALJ also subsequently used Plaintiff's "reports of engaging in strenuous activity" as a reason to find that the prior medical findings of the

state agency consultants were persuasive and consistent with other evidence in the record. Tr. 20; *see generally* 20 C.F.R. §§ 404.1520c, 416.920c.  As best as this Court is able to tell, the "strenuous activity" referred to by the ALJ was Plaintiff's statement that "she had been 'trudging through some heavier snow'" in March 2018; reports of doing some gardening; and comment that she had been "'somewhat active' in order to 'manage her pain.'"  Tr. 18; *see* Tr. 779 ("She stated she continues to be somewhat active so [sic] manage her pain.").

The Commissioner's reliance on *Qualls* is unpersuasive.   In *Qualls*, the claimant could "read, watch television, do crafts, raise flowers, visit her parents regularly, attend church twice a week, drive, attend to personal business, cook, clean, do laundry, go grocery shopping, and take care of her grandchildren."  158 F.3d at 428.  Plaintiff has been approved for 3.5 hours of PCA services per day to assist her with dressing, grooming, bathing, transferring positions, and going to the bathroom.  Plaintiff's aunt also takes care of most of the cooking, laundry, and household chores.  *Qualls* does not stand for the proposition that "the Eighth Circuit has found even fewer, less exertional daily activities [than Plaintiff's] to be inconsistent with complaints of disabling symptoms."  Comm'r's Mem. in Supp. at 14.

Recall that the physical demands of medium work require lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds as well as standing or walking off and on for a total of six hours in an eight-hour day.  20 C.F.R. §§ 404.1567(c), 416.967(c); SSR 83-10, 1983 WL 31251, at *6.  While Plaintiff may have trudged through some heavier snow during a Minnesota March, occasionally

46

shopped and gardened, done some walking, and desired to live independently, the limited nature of Plaintiff's regular physical activities gives the Court significant pause as to Plaintiff's "ability to perform the requisite acts [of medium work] day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Reed*, 399 F.3d at 923; *see Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) ("Of course, the ability to do activities such as light housework and visiting with friends alone are insufficient reason to discredit Milam's subjective complaints." (quotation omitted)).

In *Stewart*, the claimant "admitted to activities that included: reading, watching T.V., napping, driving for short periods, attending to his personal needs, occasionally shopping and visiting friends." 957 F.2d at 584. The claimant further "stated that he could sometimes walk a block, could stand for an hour (a total of two to three hours in an eight-hour period), sit for two to three hours and lift five to six pounds occasionally." *Id.* While the *Stewart* claimant's activity level is closer to Plaintiff's activity level, it too was *more not less* extensive than Plaintiff's. Again, Plaintiff's PCA assists with her personal care, including dressing, grooming, bathing, transferring positions, and going to the bathroom. Further, in *Stewart*, the Eighth Circuit noted that this activity level was "consistent only with *sedentary* occupations,"[19] not medium work. *Id.* at 587 (emphasis added).

---

[19] Under the regulations,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain

While daily activities are just one of several factors to be considered by the ALJ, the Court is hard-pressed to conclude on this record that the ALJ's reliance on "reports of [Plaintiff] engaging in strenuous activity" as part of the determination that her statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with other evidence in the record was supported by substantial evidence in the record as a whole.

Based on the foregoing, Plaintiff's motion is granted in part and denied in part; the Commissioner's motion is granted in part and denied in part, the ALJ's residual-functional-capacity determination[20] and decision is vacated as to steps four and five; and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

[Continued on next page.]

---

amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met

20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a); *see* SSR 83-10, 1983 WL 31251, at *5.

[20] Because the Court has vacated the ALJ's residual-functional-capacity determination and decision as to steps four and five on grounds related to the evaluation of Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms, the Court declines to address the remainder of Plaintiff's challenges to the ALJ's residual-functional-capacity determination.

## IX. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 22, is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 27, is **GRANTED IN PART** and **DENIED IN PART**.

3. The ALJ's residual-functional-capacity determination and decision is **VACATED** as to steps four and five.

4. This matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

Dated: September___12___, 2022

_____*s/ Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*Maysee T. L. v. Kijakazi*
Case No. 21-cv-410 (TNL)